Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 3573 | DATE | 5/2/2001 |
| CASE TITLE | MARIE RINALDI vs. WORLD BOOK, INC. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [7-1] is granted in part and denied in part.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | number of notices |
| | Notices mailed by judge's staff. | | MAY - 3 2001 |
| | Notified counsel by telephone. | | date docketed |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | | IS |
| | Copy to judge/magistrate judge. | | docketing deputy initials  23 |
| | | | date mailed notice |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
MAY - 3 2001

MARIE RINALDI and KATHY HICKS, )
)
Plaintiffs, )
) No. 00 C 3573
v. )
)
WORLD BOOK, INC., ) Judge John W. Darrah
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Marie Rinaldi (Rinaldi) and Kathy Hicks (Hicks), commenced an action against defendant, World Book, Inc. (World Book), alleging sex discrimination under Title VII of the Civil Rights Act of 1964, violation of the Equal Pay Act (EPA), 29 U.S.C. § 206(d), and breach of contract in relation to severance pay plaintiffs received following termination of their employment with defendant. Before this Court is defendant's Motion for Summary Judgment.

### I. FACTS

#### A. Plaintiff Rinaldi

In 1974, Rinaldi became an officer for defendant. (Plaint.'s 56.1(a)(3) Statement ¶ 10). In 1997, she was Vice-President - Sales Services. (Def.'s 56.1(a)(3) Statement ¶ 14). In that position, Rinaldi's responsibilities included revising sales and promotional materials for the sales field, finding hotels for meetings, running the international achievement conference, supervising the relationship between defendant's home office and the offices of its distributors, hiring and training staff for the home office, providing supplies and equipment, establishing administrative policies for defendant's offices, administering warehouse operations, and making sure that sales orders were



being filled promptly. (Id., at ¶ 15). At the time of her termination, Rinaldi had no employees reporting to her. (Id., at ¶ 16).

Rinaldi does not consider herself an expert in computer programs or computer hardware. (Def.'s 56.1(a)(3) Statement ¶ 17). She is not as knowledgeable about computers as Loren Jacobson (Jacobson) and was not qualified to perform his position of Vice-President - Information Services. (Id., at ¶ 18).

Rinaldi first became aware that World Book had a policy manual sometime in the 1970's, but she did not review the policies at that time. (Def.'s 56.1(a)(3) Statement ¶ 23). Rinaldi received an employee handbook sometime in the 1980's. When she received the handbook, Rinaldi signed an acknowledgment of receipt of the handbook. The acknowledgment, dated February 5, 1988, stated, in part:

> Nothing contained in this manual or policy manual to which it refers is intended to create a contract between World Book, Inc. and any employee... No employee has any vested right in any policy or procedures set forth in this manual or in the policy manual. All such policies and procedures are subject to change without notice. (Id., at ¶ 25).

Rinaldi understood that World Book could change its policies and various World Book policies and that benefit programs had changed over the course of Rinaldi's employment with World Book. (Id., at ¶¶-26-27).

A policy, known as "AC-7", dated September 1, 1994, was the first document Rinaldi received from World Book that indicated the amount of severance benefits she would receive if World Book terminated her employment. (Def.'s 56.1(a)(3) Statement ¶ 28). Policy AC-7 applied to employees hired or promoted on or after January 1, 1991 through August 31, 1994. Employees

2

hired or promoted prior to January 1, 1991, including plaintiffs, were eligible for severance payment of one month's salary for each year of service up to a maximum of twelve months' salary. (Id., at ¶¶ 30-31). Prior to her receipt of AC-7, Rinaldi believed that she would receive severance pay from World Book in accordance with an oral statement made to her in 1974 when she became an officer. Based on the oral representation, Rinaldi believed she would receive 12 months of salary if she was terminated. (Id., at ¶ 29).

In January 1996, Rinaldi received the 1995 Plan. (Def.'s 56.1(a)(3) Statement ¶ 32). Rinaldi understood that the Plan provided for a minimum benefit of two weeks' pay and a maximum benefit of 13 weeks' pay as a severance benefit. (Id., at ¶ 33). After receiving the Plan, Rinaldi did not speak to anyone about the Plan. She was not happy with the Plan, and she understood that defendant meant for the Plan to be the complete statement of what severance she would receive if she was involuntarily terminated. (Id., at ¶ 34; Rinaldi's Dep. pp. 111-112).

Defendant eliminated Rinaldi's position, and her employment was terminated effective June 30, 1997. (Def.'s 56.1(a)(3) Statement ¶ 35). At the time of her termination, Rinaldi was considered a Home Office Employee who worked at least 37.5 hours per week, and she did not have any non-secretarial regular employees reporting to her; therefore, she was considered a "Non-Managerial Regular Employee" under the Plan. (Id., at ¶¶ 36-38). As a Non-Managerial Regular Employee, Rinaldi was eligible to choose either a lump sum payment equal to two weeks of base pay or Supplemental Unemployment Severance Pay. (Id., at ¶ at 39). Rinaldi chose the lump sum payment and received two weeks of base pay. (Id., at ¶ 40). On June 24, 1997, Rinaldi signed the Plan's waiver and release. (Id., at ¶ 42). No one demanded that Rinaldi sign the waiver and release at the time it was presented to her. (Id., at ¶ 43). At the time she signed the waiver and release, Rinaldi

3

was of sound mind and body, and she understood that she was signing a legal document. (Id., at ¶¶ 44-45). Prior to signing the release and waiver, Rinaldi asked and was informed that she could not receive her vacation until she signed the waiver and release. (Plaint.'s 56.1(a)(3) Statement ¶ 19).

On June 26, 1998, Rinaldi filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging that defendant violated Title VII by paying her less severance pay than male vice-presidents. (Def.'s 56.1(a)(3) Statement ¶ 46). Rinaldi filed the present suit on June 14, 2000. (Id., at ¶ 48).

B. Defendant Hicks

In 1986, Kathy Hicks (Hicks) became an officer for defendant. (Plaint.'s 56.1(a)(3) Statement ¶ 14). In 1997, she was Vice-President-Sales Administration. (Def.'s 56.1(a)(3) Statement ¶ 49). In her position, Hicks served as a liaison between the sales field and the home office. Her duties included support services to the sales field, supervising sales accounting, providing sales support to defendant's school library division, providing reports, running sales contests, handling complaints from the sales force, supervising the customer service operation, and supervising the payroll of the school library division. (Id., at ¶ 50).

Hicks never had a written employment contract with defendant. (Def.'s 56.1(a)(3) Statement ¶ 55). Hicks was aware of defendant's personnel policy manual in the 1970's and 1980's. As of 1982, whenever there were changes to the manual, Hicks received the changes and replaced or added the content of what she received to the manual maintained in her department. (Id., at ¶ 56). Sometime prior to March 1998, Hicks received an employee handbook. (Id., at ¶ 57). When she received the handbook, Hicks signed an acknowledgment of receipt of the handbook. The acknowledgment, dated March 2, 1998, contains the same information as the acknowledgment

4

signed by Rinaldi described above. (Id., at ¶ 58). During her tenure, various benefit programs changed. (Id., at ¶ 59).

Sometime after 1998, when Hicks became a vice-president, she received a copy of defendant's severance pay policy for officers. She received either policy AC-6 or AC-7. (Def.'s 56.1(a)(3) Statement ¶ 60). Policy AC-6 provides that officers would receive one month's salary for each year of service up to a maximum of 12 months. (Id., at ¶ 61).

Effective September 29, 1997, defendant eliminated Hick's position and terminated her employment. (Def,'s 56.1(a)(3) Statement ¶ 63). At the time of her termination, Hicks was a Home Office Employee who worked at least 37.5 hours per week, and she had at least one non-secretarial regular employee working for her. Therefore, Hicks was considered a "Managerial Regular Employee" under the Plan. (Id., at ¶¶ 64-66). As a Managerial Regular Employee, Hicks was eligible to choose either a lump sum payment equal to one week base pay for each year of service with defendant up to a maximum of 13 weeks or Supplemental Unemployment Severance Pay. (Id., at ¶ 67). Hicks signed the Plan's waiver and release agreement on September 29, 1997 and received 13 weeks' worth of base pay at the time of termination. (Id., at ¶¶ 68-69). Hicks did not have any impairment that prevented her from reading the release and waiver; however, she did not read it prior to signing. (Id., at ¶¶ 71-72). At the time she signed the waiver and release, Hicks believed that there was a possibility that she needed to sign the waiver to receive her last week's check and vacation time. (Plaint.'s 56.1(a)(3) Statement ¶ 23; Hick's Dep. pp 159-60).

On June 19, 1998, Hicks filed a charge with the EEOC, alleging that defendant violated Title VII by paying her less severance pay than male vice-presidents. (Def.'s 56.1(a)(3) Statement ¶ 75).

## C. World Book's Severance Policy/Plan

Prior to 1995, defendant had a set of written policies that applied to officers. (Plaint.'s 56.1(a)(3) Statement ¶ 1). Pursuant to one of these policies, an officer who was involuntarily terminated was entitled to receive one month of salary for each year of service up to a maximum of one-year's salary. (Id., at ¶ 4). In November 1995, World Book adopted the "Severance Benefit Plan" (Plan). (Def.'s 56.1(a)(3) Statement ¶ 5). Under the terms of the Plan, any "Regular Employee" of World Book was eligible for benefits under the Plan. (Id., at ¶ 6). A "Regular Employee" was a "Home Office Employee" who regularly worked at least 37.5 hours per week for World Book. (Id., at ¶ 7). A "Home Office Employee" was an employee who regularly worked at one of World Book's Illinois-based home offices. (Id., at ¶ 8).

The Plan provided that severance pay would not be paid in the event that the employee did not sign a release of claims against World Book in the form required by World Book. (Def.'s 56.1(a)(3) Statement ¶ 9). The release agreement associated with the Plan provided, in part:

> In consideration of the payment by World Book, Inc. of a severance pay benefit in accordance with the provisions of ... the Plan I [name of employee], hereby promise not to sue or make any legal claims against World Book, Inc., ... and I release it from liability for claims, charges, or lawsuits that I could bring.... Specifically, I waive all claims and rights under the federal and state discrimination laws, ... and any claims for wrongful discharge or breach of employment contract that I could assert.
>
> I agree and acknowledge that this Waiver and Release is being given only for the consideration stated in the first paragraph above and that no other representations or promises have been made to me by anyone in exchange for this Waiver and Release. This Waiver and Release affects only those claims, charges, and lawsuits that accrued, or are based on events that occurred, prior to or at the time of my signing this document. (Id., at ¶ 10).

The Plan is an active policy used in severance situations and requires ongoing administration. (Id.,

6

at ¶ 11). The Plan was distributed to World Book employees on or about February 1996. (Id., at ¶ 13).

D. Other World Book Employees

Effective March 31, 1996, John Scott (Scott), Vice-President - Sales, retired from defendant. (Def.'s 56.1(a)(3) Statement ¶¶ 86, 89). Scott was not laid-off pursuant to the Plan. (Id., at ¶ 90). At the time of retirement, Scott had arranged for a two-year consulting contract under which he was paid one year of his salary of the two-year time period. (Id., at ¶¶ 91-92).

On August 29, 1997, Loren Jacobson (Loren) was laid-off from defendant. At that time, Jacobson was Vice-President-Systems/MTS. (Def.'s 56.1(a)(3) Statement ¶ 77). Jacobson had worked within the computer or information services field for the entire span of his 27-year career with defendant. (Id., at ¶ 78). Jacobson's responsibilities included all aspects of defendant's data systems, technical services, systems development, and order processing. (Id., at ¶ 79). Jacobson also built and maintained defendant's disaster recovery capability for the critical computer systems. (Id., at ¶ 80).

In September 1997, Jacobson received 13 weeks' severance pay upon his termination. (De.'s 56.1(a)(3) Statement ¶ 82). That same month, defendant entered into a consulting contract with Jacobson that retained Jacobson's services as a programming, data, and systems consultant because of Jacobson's knowledge of these systems and defendant's belief that they were critical to its ongoing business. (Id., at ¶¶ 83-84).

II. ANALYSIS

Summary judgment is proper if " the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

7

material fact." Fed. R. Civ. P. 56(c). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). However, the nonmovant must still come forward with evidence establishing the elements of her claim on which she bears the burden of proof at trial. *Miller*, 203 F.3d at 1003.

A. Release and Waiver of Claims

Defendant argues that plaintiffs' claims are barred by the release and waiver signed by each plaintiff. Plaintiffs argue that the release and waiver is invalid because: (1) there was no consideration given for the release; (2) they were procured through duress; and (3) they were not given knowingly and voluntarily.

Consideration under the law of contracts is relatively easy to demonstrate. *Wagner v. Nutrasweet Co.*, 95 F.3d 527, 532 (7th Cir. 1996) (*Wagner*). "As long as the person receives something of value in exchange for her own promise or detriment, the courts will not inquire into the adequacy of the consideration." *Wagner*, 65 F.3d at 532.

Plaintiffs argue that defendant already committed to giving them a severance package when they became officers within the company; therefore, they gained nothing when they signed the release and waiver. However, the undisputed facts demonstrate that the 1995 Plan included both officers and non-officers. Rinaldi testified in her deposition that she was upset about the Plan because she thought she should get more than two weeks' severance pay, demonstrating that she believed the 1995 Plan applied to her, as an officer, and the previous severance packages no longer applied. Both plaintiffs also continued their employment with defendant after the change in benefits. Further, plaintiff has not provided any evidence that any officer that was involuntarily terminated

8

had not received a severance package pursuant to the 1995 Plan. Accordingly, the benefits each plaintiff received were enough to satisfy the consideration requirement. *See Wagner*, 95 F.3d at 532 (rejecting plaintiff's argument that consideration was lacking because she was already entitled to severance pay).

Plaintiffs next argue that the release and waiver were procured through duress because they were told that their accrued vacation pay would be withheld unless they signed the release.

"Duress is a defense to an otherwise valid contract." *Pierce v. Atchison, Topeka & Sante Fe Ry. Co.*, 65 F.3d 562, 569 (7th Cir. 1995). To prove duress, the plaintiff must show that the defendant's wrongful act caused her to be "bereft of the quality of mind essential to making a contract." *Resolution Trust Corp. v. Riggiero*, 977 F.2d 309, 313 (7th Cir. 1992), quoting, *Alexander v. Standard Oil Co.*, 423 N.E.2d 578, 582 (1981) (*Alexander*).

Here, Rinaldi presents, through her deposition testimony, that defendant told her that she must sign the release and waiver to obtain her accrued vacation time. However, Rinaldi also testified that no one pressured her to sign the waiver and release and that she had time to review the document but only "kind of looked it over", nor did she ask any questions about the release or waiver. In addition, the release signed by Rinaldi stated that "no other representations or promises have been made to me by anyone in exchange for this Waiver and Release." Under these facts, Rinaldi failed to show that she was induced to sign the waiver and release "bereft of the quality of mind essential to making a contract."

Hicks presents, through deposition testimony, that there was a possibility that she believed she had to sign the waiver and release to receive her accrued vacation and last pay check. However, she presents no evidence from where her perception came and does not attribute it to the defendant.

9

In addition, Hicks failed to read the document before signing it and did not ask any questions before signing. Hicks also has failed to show that she was induced to sign the waiver and release "bereft of the quality of mind essential to making a contract."

Furthermore, plaintiffs retained the benefits of signing the waiver and release by accepting and keeping the severance pay; and this is precisely what a release is, *i.e.*, giving up a cause of action for money. By retaining the benefits, plaintiffs ratified the release, and they cannot now void the contract. *See Riv Vil, Inc. v. Tucker*, 979 F.Supp. 645, 656 (N.D.Ill. 1997); *Constant v. Continental Tele. Co. of Ill.*, 745 F.Supp. 1374, 1385 (C.D.Ill. 1990); *Alexander*, 423 N.E.2d at 583.

Plaintiffs also argue that they did not knowingly and voluntarily sign the waiver and release. The determination whether a release was given knowingly and voluntarily is made by assessing the totality of the circumstances, including, but not limited to: (1) the employee's education and business experience, (2) the employee's input in negotiating the terms of the contract, (3) the clarity of the agreement, (4) the amount of time the employee had for deliberation before signing the release, (5) whether the employee actually read the release and considered its terms before signing it, (6) whether the employee was represented by counsel or consulted with an attorney, (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law, and (8) whether the employee's release was induced by improper conduct on the defendant's part. *Pierce*, 65 F.3d at 571.

Here, arguably, a few factors weigh in favor of the plaintiffs; however, significant factors weigh in favor of the defendant. It is not disputed that plaintiffs did not have any input in negotiating the terms of the contract; they failed to read the contract before signing it, and they were not represented by counsel. There are allegations that defendant told plaintiffs that they would not

10

receive accrued vacation pay until they signed the release. On the other hand, the record is equally clear that plaintiffs have a high school education and were experienced long-term officers within the company; the release clearly sets forth what rights are being waived; plaintiffs had time to review the contract prior to signing it, and the consideration given in exchange for the release exceeded the benefits to which plaintiffs were already entitled. Plaintiffs do not argue that any part of the release is ambiguous and not capable of being understood. At her deposition, Rinaldi read the release and stated that there were no words that she could not read or not understand and that none of the words confused her. Under the totality of the circumstances described above, plaintiffs have failed to establish a question of material fact whether they voluntarily and knowingly signed the release and waiver.

Based on the above findings, the waivers and releases signed by plaintiffs were valid. Therefore, plaintiffs have waived their breach of contract claims. Plaintiffs' discrimination and EPA violation claims remain because those claims were not known to the plaintiffs at the time they signed the releases and waivers. *See Gavery v. McMahon v. Elliott*, 670 N.E.2d 822, 825 (1996).

B. Title VII Claims

Defendant argues that Rinaldi's Title VII claim is time-barred. A plaintiff must file a charge of discrimination with the EEOC or equivalent state agency within 300 days after the "alleged unlawful practice." 42 U.S.C. § 2000e-5(e)(1). The 300-day limit begins to run when the defendant has taken the action that injures the plaintiff and when the plaintiff knows she has been injured. *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001).

In the instant case, the alleged action taken by the defendant was paying plaintiffs less severance pay than male counterparts. Rinaldi's alleged injury is the receipt of less severance pay.

11

Rinaldi suspected that Jacobson received greater than two weeks' severance pay in the end of August 1997. Her suspicion was heightened in April 1998, after reviewing a letter concerning Scott's resignation package. Rinaldi argues that April 1998 was the time the statute of limitations began to run. However, the limitations period begins to run when a reasonable person would believe that she may have a cause of action, not when she is certain her rights have been violated. *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 269 (7th Cir. 1995). Rinaldi suspected that Jacobson received greater than two weeks' severance pay in late August 1997, and she was already aware that she had only received two weeks' severance pay. Therefore, Rinaldi's Title VII cause of action began to run in late August 1997. Rinaldi then had 300 days in which to file her charge with the EEOC. Rinaldi filed her EEOC charge on June 26, 1998. Therefore, her Title VII claim was timely filed.

Defendant also argues that plaintiffs cannot establish a Title VII cause of action.

A plaintiff may prove discrimination through either direct evidence or through the indirect burden-shifting method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999) (*Jackson*). Under the first approach, a plaintiff must show either an acknowledgment of discrimination by the defendant or circumstantial evidence that provides a basis for an inference of intentional discrimination. *Gorence v. Eagle Food Centers, Inc.*, __ F.3d __, __ (7th Cir. 2001) (*Gorence*). Circumstantial evidence can be (1) suspicious timing, ambiguous statements, behavior toward or comments directed at other employees or (2) evidence that similarly situated employees were treated differently or (3) evidence that the plaintiff was qualified for the job and passed over for the job, and the employer's reason for the difference in treatment is pretext for discrimination. *Gorence*, __ F.3d at __; *Troup v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) *(Troup)*. The plaintiff is not required to produce the

12

equivalent of an admission of guilt by the defendant. "All that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had [received less severance pay] because the latter was a member of a protected class", in this case, a female. *Troup*, 20 F.3d at 737.

Plaintiffs argue that the affidavit of William K. Phillips (Phillips), a World Book Vice-President, demonstrates that Scott's and Jacobson's agreements were a sham in an effort to disguise the discriminatory treatment toward plaintiffs; and, as such, they provide circumstantial evidence of discrimination. In his affidavit, Phillips states that he spoke with Ralph Schey, a World Book Chairman, about Scott's and Jacobson's termination. He avers that Schey's resignation and Jacobson's consulting agreement were made in order to provide each with a better severance package. He also avers that he informed Schey that the different treatment of Scott and Jacobson from plaintiffs amounted to discrimination. Shortly thereafter, Schey informed Phillips that he would take care of things and not to say anything further. Phillips' position in the company was such that he would be privy to such conversations, that he could have been involved in either Schey and/or Jacobson's resignation and consulting agreement, and, therefore, support his affidavit. In addition, Jacobson informed Rinaldi in August 1997 that defendant "took care of him" when she asked about his termination.

Based on these facts, a rational trier of fact could reasonably infer that the defendant had paid plaintiffs less severance pay because they were females. Accordingly, summary judgment is not appropriate.

C. EPA Claims

The EPA prohibits sex-based wage discrimination. 29 U.S.C. § 206(d)(1); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 14610462 (7th Cir. 1994). To establish a *prima facie* EPA claim,

13

plaintiffs must show that: (1) different wages were paid to employees of the opposite sex; (2) the employees do equal work that requires equal skill, effort, and responsibility; and (3) the employees have similar working conditions. *Snider v. Belvidere Township*, 216 F.3d 616, 619 (7th Cir. 2000).

Defendant argues that plaintiffs' EPA claims are time-barred. An EPA claim for discrimination must be filed no more than two years after the date of the alleged violation, or within three years in the case of a willful violation. 29 U.S.C. § 255(a). Plaintiffs argue that their EPA claims are not time-barred because their claims are based on the defendant's willful violation of the EPA as demonstrated by Jacobson's "sham" consulting agreement made after Phillips warned Schey of the possibility of discrimination based on plaintiffs' and Jacobson's severance pay. The arrangement made by defendant for Jacobson's benefit establish a question of material fact whether defendant willfully violated the EPA. Accordingly, plaintiffs' EPA claims are not time-barred.

Defendant also argues that plaintiffs cannot prove a cause of action under the EPA.

Plaintiffs allege that they received different termination benefits than male counterparts Scott and Jacobson. Scott was not involuntarily terminated as were plaintiffs and Jacobson; instead, he resigned and received a "resignation package". Plaintiffs do not dispute that Scott was not involuntarily terminated. Plaintiffs argue that the resignation was nothing more than termination benefits so he is an appropriate individual to compare their wages against. In addition, defendant and Scott were aware of possible termination of employees at the time of Scott's resignation. Scott's voluntarily resignation at a time when the defendant was aware that employees were going to be terminated and the receipt of benefits well above the benefits that he would have received had he not resigned at the time that he did demonstrate that questions of material fact remain as to whether Scott is an appropriate person to which plaintiffs' termination benefits can be properly

14

compared.

As to Jacobson, plaintiffs have established that Jacobson was paid a different severance pay than employees of the opposite sex. Defendant argues that Jacobson received the correct severance pay under the Plan. However, plaintiffs have provided evidence that Jacobson did not have a "Regular Employee" reporting to him so he should have received two weeks' severance under the plan as opposed to the thirteen weeks of severance pay he did receive.

Defendant also argues that plaintiffs' work did not require equal skill, effort, and responsibility as Jacobson's work. To establish the equal work element, plaintiffs must show that their jobs and Jacobson's job involved a "common core of tasks" or that "a significant portion of the two jobs is identical." *Fallon v. State of Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989) (*Fallon*). If a common core of tasks is established, the question then becomes whether any additional tasks made the jobs substantially different. *Fallon*, 882 F.2d at 1209.

In the instant case, plaintiffs and Jacobson all were Vice-Presidents, and all three individuals had administrative responsibilities. Thus, a common core of tasks is established. Defendant argues that Jacobson's duties went beyond administrative responsibilities and that he had information about the computer system known only to him. Plaintiffs argue that their responsibilities also went beyond administrative tasks and that Jacobson was not performing all of the non-administrative responsibilities at the time he was terminated, but an outside consultant was doing such work. In support of their argument, plaintiffs rely on Phillips' affidavit. While Jacobson did not report to Phillips at the time he was terminated, as found above, Phillips' position in the company is such that he would have knowledge about Jacobson's responsibilities. Plaintiffs have demonstrated material questions of fact remain as to whether Jacobson's additional tasks made his position substantially

15

different than plaintiffs'. Accordingly, summary judgment on plaintiffs' EPA claims is not appropriate.

III. CONCLUSION

For the reason stated above, defendant's Motion for Summary Judgment is granted in part and denied in part. Defendant's Motion for Summary Judgment as to plaintiffs' breach of contract claims is granted. Defendant's Motion for Summary Judgment as to plaintiffs' Title VII claims and Equal Pay Violation claims is denied.

Dated: May 2, 2001

JOHN W. DARRAH
United States District Judge

16